UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

IN RE:                                       )
                                             )
Heartland Feed, Inc.,                        )     Bankruptcy Case No. 07-30051
                                             )     Chapter 11
                                             )
            Debtor.                          )
                                             )

**MEMORANDUM AND ORDER**

On February 23, 2007, The Bank of Tioga filed a Motion for Relief from Stay.  The Bank of Tioga seeks relief from the automatic stay of 11 U.S.C. § 362(a) "for cause" pursuant to 11 U.S.C. § 362(d)(1) and pursuant to 11 U.S.C. § 362(d)(2) based upon the alleged facts that Heartland Feed, Inc. has no equity in the property provided as collateral to The Bank of Tioga; and that the property is not necessary to an effective reorganization.  Debtor Heartland Feed, Inc. resists said Motion.  A hearing was held on March 20, 2007.  The following constitutes the Court's findings of fact and conclusions of law:

**FINDINGS OF FACT**

Heartland Feed, Inc. is registered to do business in the State of North Dakota with its principal place of business in Tioga, North Dakota.  Heartland grows and processes alfalfa which is sold to the equine and dairy industries as feed.  To make transportation more economical, Heartland compresses the alfalfa into cubes and bales.

Heartland was funded for business in July 2002.  Operations were originally set to begin in October 2002, but did not begin until August 2003.  Michael Bloyed, president of Heartland, testified that the delay was due to the late delivery of Heartland's machinery.  The expected

delivery time was three to four months, but actual delivery time was one year and even then delivery was piecemeal. The cost of the machinery totaled $1,898,510.00.

Funding for Heartland's operations came from two sources. At the outset, Heartland's shareholders, Michael Bloyed, Frank Moore and Robert Gray, contributed $960,000.00, or 40% of the start-up costs. On July 1, 2002, Heartland obtained two loans from The Bank of Tioga ("the bank") totaling $1,440,000.00, or 60% of the start-up costs. The first loan, loan number 32665, was in the amount of $940,000.00 and its stated purpose was for the purchase of machinery. As of February 14, 2007, the total balance owing, including principal, interest, and late fees, was $952,916.36. The second loan, loan number 32664, was for $500,000.00 and the purpose of this loan was to cover working capital. As of February 14, 2007, the total balance owing on this loan, including principal and interest, was $378,770.34.[1] Both loans were secured by a commercial security agreement and the stated collateral for these loans was:

> All machinery, equipment, tools, office equipment, furniture, and trade fixtures, storage buildings, bins, silos, and fixtures. All inventory, raw materials, farm products, crops, grain, seeds, feeds, accounts, accounts receivable, all margin accounts, book accounts, documents of title, warehouse receipts, truck and railroad bills of lading, all stock, equities, investments, allocated credits (patronage or otherwise) held in the name of the Grantor, or for its benefit, on the books and records of any other cooperative, corporation or other entity, contract rights, and general intangibles.

Additionally, Bloyed personally signed a commercial guaranty with the bank on July 1, 2002. Lastly, the loans are guaranteed by the United States Department of Agriculture Rural Business-

---

[1] In its Motion, The Bank of Tioga lists the amount owing on Loan number 2 as $392,159.04. This is a mathematical error as the amounts listed in the Motion total $378,770.34. The Court assumes the disparity in the two numbers is due to the bank's failure to list late fees in its Motion.

2

Cooperative Service for 80% of the amounts owing. These documents were executed on July 1, 2002.

During Heartland's operations additional money was received from both the shareholders and the bank. Bloyed testified that the shareholders invested an additional $980,000.00 into the operation and Heartland received another loan from the bank in September, 2002 in the amount of $75,000.00. As of December 19, 2006, the total balance owing was $80,565.28.[2] The purpose of this loan is not stated. The loan is secured by Heartland's inventory and accounts receivable. When all was said and done, Heartland received a total of $1,515,000.00 in loans from the bank and as of February 14, 2007, Heartland owed $1,412,251.98.[3]

Heartland ceased operations in July 2006. A major factor which caused Heartland to cease operations was the late delivery of its machinery. Mr. Bloyed testified that Heartland went through much of its working capital to pay off other debt while waiting for the machinery. Other factors that contributed to Heartland's demise included increased fuel costs that made it unprofitable to ship alfalfa from Tioga, North Dakota, and overall changes in the way purchasers were buying feed.

---

[2] Another mathematical error had the bank's Motion listing an incorrect balance of $80,535.28 as owing on this loan.

[3] The evidence presented prior to and during the hearing either listed only the principal balance owing or listed principal balance, late fees and accrued interest up to a date which is later than the filing date. The Bankruptcy Code does not permit interest to accrue on a creditor's claim after the bankruptcy petition has been filed. 11 U.S.C. § 502(b); In re Foertsch, 167 B.R. 555, 559 (Bankr. D.N.D. 1994). This issue, however, is not germane to the Court's Order since even without accounting for accrued interest, the amount owing the bank is far in access of the value of the machinery.

After it became evident that Heartland was struggling, Heartland and the bank began working together to solve the problem. In April 2005, Heartland asked for, and was granted, an eight-month moratorium on payments. Unfortunately, Heartland's position did not improve during these eight months. Heartland and the bank met again in January 2006, and Heartland decided to sell its large processor. The bank gave Heartland until April 15, 2006, to sell the processor, but no sale took place. Therefore, in April 2006, the bank sent a letter to Heartland notifying it of the bank's intentions to liquidate the processor. After this notice, but before liquidation by the bank occurred, Heartland notified the bank that it had a purchaser lined up for the machinery. Again, though, no sale took place. Currently, the machinery is being stored in a secured winterized building in Tioga, North Dakota. Although the machinery is not in use, both it and the building where it is stored are fully insured.

For seven months the bank continued its efforts to liquidate the machinery. The bank searched databases of agricultural processors and sent out forty-four packets soliciting bids on the machinery. The bank was also contacted by several other parties who requested packets. Ultimately, the bank showed the machinery to six parties. Three parties made bids, two for all of the machinery and one for some of the machinery. Of the two bids for all the machinery, one was an unconditional bid in the amount of $450,000.00. The other was a conditional bid of $500,000.00. Whatever the condition placed on this bid was, it was not discussed during the hearing. The bank decided to accept the $450,000.00 bid because it was unconditional. The bank received two calls from other financial institutions demonstrating the purchasing party's ability to pay.

David Grub, president of the bank, testified that the $450,000.00 bid is very competitive. After working for seven months on a liquidation plan, the bank concluded that the liquidation value for this machinery is between $410,000.00 and $625,000.00. No fair market value was provided during the hearing, but on cross-examination Mr. Grub conceded that fair market value would be higher than the liquidation value. Grub explained that $450,000.00 is a fair sales price for a number of reasons: the machinery is no longer considered state of the art; it bales the alfalfa with wire instead of using a newer strap technology; and it may be underpowered for any use other than alfalfa processing. Grub fears that if the stay is not lifted, the purchaser will pull out of the deal and the bank will lose hundreds of thousands of dollars.[4]

Frank Moore, a shareholder of Heartland and the president of Asset Management & Associates, explained the basics of Heartland's anticipated plan of reorganization. First, the shareholders intend to sell 25% of Heartland to an agent of the United Arab Emirates for $3,500,000.00. The government of UAE purchases alfalfa for its citizens to use as goat and camel feed, and this purchase would reserve UAE's right to buy alfalfa at a discounted price in the future. Moore testified that UAE could purchase 110 tons of alfalfa annually.

Next, Heartland will continue to operate in the United States as a marketing agent, but its operations will be moved from Tioga, North Dakota to Argentina. Moore has made two extensive trips to Argentina and has spoken with farmers and government officials. He believes there is a large, untapped potential for alfalfa production there. Moore testified that Heartland

---

[4] In its Motion for Relief From Stay, the bank also sought its collateral other than the machinery, namely inventory and accounts receivable. Bloyed, however, testified that Heartland has no inventory and no evidence was presented that there are any accounts receivable. When the Court uses the term "machinery" with regard to it being collateral securing the bank's loans, this term refers to all existing collateral, including any inventory or accounts receivable.

will know the outcome of this deal in roughly six weeks. This plan has been discussed with the bank, but the bank refuses to allow its collateral to be moved to Argentina.

## CONCLUSIONS OF LAW

The filing of a petition in bankruptcy provides an automatic stay as to actions taken by a creditor to realize the value of their collateral. 11 U.S.C. § 362(a); United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365, 366 (1988). The Bankruptcy Code provides that creditors may seek relief from the automatic stay under limited circumstances. 11 U.S.C. § 362(d); Bowman v. Bond (In re Bowman), 253 B.R. 233, 238 (B.A.P. 8th Cir. 2000). Relevant to this case are subsections (d)(1) and (d)(2) of section 362.

Section 362(d)(1) provides relief from the automatic stay "for cause." 11 U.S.C. § 362(d)(1). With the exception of lack of adequate protection, the Code does not define "for cause." Case law, however, instructs that relief may be granted "for cause" where: litigation involving the debtor is to continue in a nonbankruptcy forum; the debtor has acted in bad faith; and judgment against the debtor is needed in name only to collect benefits, e.g., insurance cases. See Blan v. Nachogdoches County Hosp. (In re Blan), 237 B.R. 737 (B.A.P. 8th Cir. 1999) (litigation in nonbankruptcy forum); State Bank of Benkleman v. Stute Co., Inc. (In re Stute Co., Inc.), 1996 WL 719928 (8th Cir. 1996) (bad faith); Int'l Bus. Machs. v. Fernstrom Storage & Van Co. (In re Fernstrom Storage & Van Co.), 938 F.2d 731 (7th Cir. 1991) (insurance).

The bank contends that cause exists under section 362(d)(1) because the collateral will deteriorate if not winterized and housed properly, and because it should be sold during the winter months when demand for feed is highest. The Court disagrees. First, no evidence was presented that the bank's collateral has not been properly stored and winterized. To the contrary, Bloyed

6

testified that the collateral is being stored in a winterized building that is locked and secured. A former employee of Heartland routinely checks on the building to ensure it is safe and locked. While normal depreciation for agricultural machinery is occurring, the machinery is not being used so no deterioration from use is happening. Further, both the building and the machinery are fully insured. Lastly, spring is right around the corner and the weather that the bank alleges could cause damage to the collateral is no longer a concern. Under these circumstances, the Court does not believe that deterioration is occurring.

Second, the Court does not give credence to the argument that the collateral should be sold in the winter months when demand for feed is highest. While demand may be higher during the winter months in North Dakota, both Bloyed and Moore discussed the fact that Heartland's alfalfa was not just sold in North Dakota. Although the plains of North Dakota may be ripe with vegetation during the summer months and demand for feed is low, there are many places where grazing is not possible during the summer and feed must be brought in.

For the foregoing reasons, the Court finds that "cause" does not exist under 11 U.S.C. § 362(d)(1).

The bank further alleges that relief should be granted under section 362(d)(2). Relief under section 362(d)(2) is proper when: 1) the debtor has no equity in the property; and 2) the property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2); United Savings Ass'n of Texas, 484 U.S. at 375; see also Anderson v. Farm Credit Bank of St. Paul (In re Anderson), 913 F.2d 530, 532 (8th Cir. 1990).

"The test for determining equity under the first part of § 362(d)(2) involves a comparison between the total liens against the property and the property's current value." In re Bowman,

7

253 B.R. at 238 (internal citations omitted).  A lack of equity is synonymous with the creditor being undersecured.  United Savings Ass'n of Texas, 484 U.S. at 375.  The burden of proof rests on the movant to prove that no equity exists.  11 U.S.C. § 362(g)(1); United Savings Ass'n of Texas, 484 U.S. at 375.  There is no dispute as to the total amount of the liens on the property.  In principal alone, Heartland owes the bank a total of $1,235,294.29 on the three loans.  On the two loans secured by the machinery, Heartland owes the bank principal in the amount of $1,168,520.29; on the loan secured by inventory and accounts receivable, Heartland owes principal of $66,774.00.

    The issue central to this analysis is the value of Heartland's machinery.  The bank contends that the machinery is worth its liquidation value, between $410,000.00 and $625,000.00.[5]  Evidence of this value includes the fact that the machinery is no longer state of the art; that the machinery may be underpowered for anything but alfalfa; and that during a seven-month liquidation process the only two bids received by the bank for all the machinery were $450,000.00 and $500,000.00.  On the other hand, Heartland contends that the machinery is worth $1,400,000.00.  The only evidence supporting this amount is the self-serving statement of Heartland's president, Bloyed.  Heartland provided no contending liquidation or fair market value analysis or any other supporting evidence for its claimed value.  The Court accepts the bank's value for the collateral and therefore, the bank has met its burden in proving that Heartland lacks equity in the machinery.

---

[5] Where in this spectrum the actual liquidation value falls is irrelevant since even at $625,000.00, the bank would still be undersecured.

8

Since the bank has met its burden of proof with regard to the equity analysis, the burden of proof now rests on Heartland to prove that although no equity exists, the property is necessary to an effective reorganization. 11 U.S.C. § 362(g)(2); United Savings Ass'n of Texas, 484 U.S. at 375. "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means . . . that there must be a reasonable possibility of a successful reorganization within a reasonable time. Id. (internal citations omitted). Specifically, within the Eighth Circuit a debtor must show that its plan is feasible and likely confirmable. In re Bowman, 253 B.R. at 238.

The Eighth Circuit "feasibility test" contemplates whether the provisions of the plan can actually be performed. Id. at 239. "The test is whether things which are to be done after confirmation can be done as a practical matter under the facts." Id. "Pie-in-the-sky" notions of what the future may bring are insufficient. In re Foertsch, 167 B.R. 555, 568 (Bankr. D.N.D. 1994). Visionary promises, sincerity, honesty and willingness do not make a plan feasible. In re Bowman, 253 B.R. at 239.

Unfortunately for Heartland, visionary promises are all that were presented to the Court. While the shareholders of Heartland seem sincere and are certainly willing to try their hands again in the alfalfa processing field, albeit in Argentina, they were unable to provide the Court with anything but the barest of bare plan outlines. Heartland's plan is first and foremost premised on coming to an agreement with agents of UAE. Moore testified that this could be done in six weeks. In his affidavit, Bloyed stated that it would take three months. Beyond the generic "agent of the UAE," Heartland did not provide any information about this "agent" or his

9

employer. Even if some sort of agreement could be worked out with UAE, no evidence was presented as to how long it would take to finance the plan and when the bank would be paid. Second, one of the major reasons Heartland ceased business operations in Tioga, North Dakota was the cost of shipping the processed alfalfa. With the world in its current state, the only reasonable assumption is that the cost of fuel will remain at its current level or continue to increase for the foreseeable future. While the distance between Argentina and UAE may be shorter than the distance between Tioga, North Dakota and UAE, Heartland presented no evidence as to how relocation will rectify the situation that doomed its business in the first place. Third, another problem identified by Heartland as to why its Tioga venture failed was that alfalfa buyers changed the way they were buying alfalfa. Will a move to Argentina rectify this? Has UAE not changed how it buys alfalfa? Again, no evidence was presented as to how this major problem will be solved. Fourth, Heartland, outside of two trips taken to Argentina by Moore, presented no evidence as to the viability of an alfalfa operation in Argentina. Moore testified that he has spoken to Argentinian officials as well as farmers. Did he speak with an official in the agricultural department of the government or someone whose job its is to attract new business? Are these farmers alfalfa farmers or farmers who may, if the price is right, allow Heartland to grow alfalfa on their land? Finally, why does Moore believe Argentina is a large, untapped market? In short, too many critical questions remain unanswered for the Court to be convinced that Heartland can effectively reorganize.

     Heartland's counsel argued that it should be given more time to come up with a feasible plan. The Court sympathizes with counsel. The bank filed its Motion for Relief from Stay a mere thirty days after Heartland filed for bankruptcy. At that time, only one-sixth of Heartland's

exclusive time-period for filing a plan had elapsed. 11 U.S.C. § 1121(e)(1). A party in interest, however, is free to move for relief from stay at any time, even during the exclusive planning period. In re Fenske, 96 B.R. at 247. Once a party moves for relief, the debtor's ability to reorganize is brought to the forefront and debtor must meet its burden of proof. Id. While the Court is cognizant of the fact that it should demand a less detailed plan during the exclusivity period, Heartland's "plan," as stated previously, is really no plan at all; instead, it is what Heartland hopes the future will bring.

The bank has proven that Heartland has no equity in the machinery, and Heartland has failed to meet its burden of proving that the machinery/inventory/accounts receivable securing the bank's loans are necessary to an effective and timely reorganization. Accordingly, relief under section 362(d)(2) is proper and The Bank of Tioga's Motion for Relief From Stay is in all things GRANTED.

**SO ORDERED.**

Dated this 3rd day of April, 2007

**WILLIAM A. HILL, JUDGE
U.S. BANKRUPTCY COURT**